| | | |
|---|---|---|
| **CHARLOTTE A. YELEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:07CV148 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Charlotte Yeley for Supplemental Security Income under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636 (c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 14).

## Procedural History

On June 17, 2005, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on January 1, 2003. (Tr. 50). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated November 21, 2006. (Tr. 16, 37-41, 10-15). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 24, 2007. (Tr. 5, 2-4).

- 1 -

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.    <u>ALJ Hearing</u>**

Plaintiff's administrative hearing was held on June 1, 2006.  (Tr. 211).  Plaintiff was present and was represented by counsel.  (<u>Id.</u>).  Vocational expert Gary Weimholt was also present.  (<u>Id.</u>).

Plaintiff's attorney indicated that she had requested additional medical records.  (Tr. 211-12).  The ALJ stated that he would leave the record open for an additional thirty days so that plaintiff could supplement the record.  (Tr. 212).

Plaintiff's attorney then made an opening statement.  (<u>Id.</u>).  Plaintiff's attorney stated that plaintiff suffers from severe osteoarthritis,[1] and posterior bulging discs at L5-S1 and L4-5.[2]  (<u>Id.</u>).  Plaintiff's attorney argued that plaintiff suffers from pain, which prohibits her from working.  (<u>Id.</u>).  Plaintiff's attorney stated that the only relevant work experience plaintiff has is as a housekeeper, and she is currently unable to meet the physical demands of that work due to her impairments.  (Tr. 213).

---

[1]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints.  <u>See</u> <u>Stedman's Medical Dictionary</u>, 1388 (28th Ed. 2006).

[2]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  <u>See</u> <u>Medical Information Systems for Lawyers</u>, § 6:27.

The ALJ then examined plaintiff, who testified that she was 44 years of age, and was separated.  (Id.).  Plaintiff stated that she lived with her three sons, who were aged 19, 17, and 9.  (Id.).  Plaintiff testified that she has been separated from her husband for about fifteen years.  (Id.).  Plaintiff stated that her husband lives in Poplar Bluff and does not pay child support.  (Tr. 214).  Plaintiff testified that her husband is disabled and her children receive Social Security benefits through her husband.  (Id.).  Plaintiff stated that her husband receives disability benefits from the Veteran's Administration ("VA") and Social Security, although she was unsure of the nature of his disability.  (Id.).  Plaintiff testified that her husband does not maintain regular contact with his children.  (Id.).  Plaintiff stated that her husband sees his children occasionally on holidays.  (Id.).

Plaintiff testified that she graduated from high school.  (Id.).  Plaintiff stated that she was five feet, eight inches tall, and weighed 170 pounds.  (Tr. 214-15).  Plaintiff testified that she had never been in the military.  (Tr. 215).

Plaintiff stated that she had served time in prison on one occasion, from April of 1990 to September of 1993.  (Id.).  Plaintiff testified that she was incarcerated for selling cocaine.  (Id.).  Plaintiff stated that she pled guilty in state court, in Butler County.  (Id.).  Plaintiff testified that she received a ten year sentence.  (Id.).  Plaintiff stated that she served three-and-a-half years and completed the remainder of her sentence on parole.  (Tr. 216).  Plaintiff testified that she was not on probation or parole at the time of the hearing.  (Id.).  Plaintiff stated that this was the only felony for which she was convicted.  (Id.).  Plaintiff testified that her husband was also involved in the case and served time.  (Id.).  Plaintiff stated that her husband only served eighteen months.  (Id.).  Plaintiff testified that her sister watched the children for the three or four months when both

she and her husband were incarcerated.  (Id.).

Plaintiff stated that she receives Social Security disability benefits on behalf of her children through her husband in the amount of $550.00 a month.  (Tr. 217).  Plaintiff testified that she receives food stamps in the amount of $246.00 a month.  (Id.).  Plaintiff stated that she also receives Medicaid benefits.  (Id.).  Plaintiff testified that Medicaid reinstated her benefits in June of 2005.  (Id.).

Plaintiff stated that she did not believe that she was capable of performing a sit-down job at the time of the hearing because she is unable to sit all day.  (Id.).  Plaintiff testified that she is unable to sit all day due to her bulging disc and a growth in the left side of her back.  (Id.).  Plaintiff stated that her doctors told her that they were unsure what the growth in her back was.  (Id.).  Plaintiff testified that she also has arthritis in her knees.  (Tr. 218).  Plaintiff stated that Dr. Benjamin Soeter is going to refer her to an orthopedic surgeon for her knees.  (Id.).  The ALJ instructed plaintiff to submit the records from her upcoming appointment with the orthopedic surgeon.  (Id.).

Plaintiff testified that she does not drive and that she does not own a vehicle.  (Tr. 219).  Plaintiff stated that a friend drove her to the hearing.  (Id.).  Plaintiff testified that either a friend takes her to the grocery store, or she takes a cab.  (Id.).

Plaintiff stated that she lives in a rental house that is located in town.  (Id.).  Plaintiff testified that HUD pays her rent.  (Id.).  Plaintiff stated that her husband receives both VA and Social Security disability.  (Id.).  Plaintiff testified that her husband was injured in an accident and has significant physical and mental impairments.  (Id.).

Plaintiff stated that she was treated by a psychiatrist or psychologist only for a brief period

after she lost a child in June of 2004. (Tr. 220). Plaintiff testified that the child died at birth. (Id.). Plaintiff stated that she did not believe she had any mental health problems at the time of the hearing. (Id.).

Plaintiff testified that she did not engage in substance abuse. (Id.). Plaintiff stated that she never used cocaine. (Id.). Plaintiff testified that she sold cocaine when she was pregnant to make money but she never used the drug. (Id.). Plaintiff stated that she has smoked marijuana and used methamphetamine in the past. (Id.). Plaintiff testified that she has been clean for over thirteen years. (Id.). Plaintiff stated that she had not smoked cigarettes for five years. (Id.). Plaintiff testified that she never drank alcohol. (Tr. 221).

Plaintiff stated that the owner of the home in which she lives cuts the property's grass. (Id.). Plaintiff testified that her sons trim the weeds at the property. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she has worked at cleaning jobs in the past fifteen years. (Id.). Plaintiff stated that she cleaned in a nursing home, public housing units, and schools. (Id.). Plaintiff testified that after she was incarcerated, she could no longer work in schools. (Id.). Plaintiff stated that she also worked at Clean Uniform Company. (Id.). Plaintiff testified that all of the jobs she has had involved cleaning. (Id.). Plaintiff stated that she has not worked in ten years. (Tr. 222).

Plaintiff testified that she did not believe that she could perform any job at the time of the hearing. (Id.). Plaintiff stated that she has difficulty taking care of herself, her home, and her three children. (Id.). Plaintiff testified that she experiences pain after working around the house. (Id.). Plaintiff stated that if she takes more pain medication, she feels so "dipsy," that she is unable to function. (Id.).

Plaintiff testified that she gets up at 6:00 a.m. to get her children ready for school and she gets up at around 7:00 a.m. when her children are not in school. (Id.). Plaintiff stated that she goes to bed no later than 10:00 p.m. (Id.). Plaintiff testified that she cooks meals for her children and does her children's laundry. (Id.). Plaintiff stated that her children help her with the laundry, vacuuming, and sweeping. (Id.). Plaintiff testified that she is able to perform housework by herself but she experiences severe back pain after doing so. (Id.). Plaintiff stated that when she sweeps, her back starts burning and swelling and she has to sit down and rest. (Tr. 223). Plaintiff testified that she uses a heating pad or ice pack on her back. (Id.).

Plaintiff stated that she goes to church every Sunday. (Id.). Plaintiff testified that church is the only place she goes regularly. (Id.). Plaintiff stated that she reads a lot. (Id.). Plaintiff testified that she used to enjoy playing with her children outside, but she is unable to be in the sun now due to her diabetic medication. (Id.).

Plaintiff stated that she experiences pain regularly in her body. (Id.). Plaintiff testified that she has seen Dr. Soeter, who is a pain management specialist. (Id.). Plaintiff stated that Dr. Soeter administered injections in her shoulder and plans to administer injections in her knees. (Id.). Plaintiff testified that she has undergone injections for her shoulder twice. (Id.). Plaintiff stated that the injections are painful and did not provide much relief. (Id.).

Plaintiff testified that she experiences pain in her left shoulder and left back. (Id.). Plaintiff stated that she has a lump on her back and she has bulging discs in her left buttock area. (Id.). Plaintiff testified that she experiences burning pain in her shoulder, shin, and lower back. (Id.). Plaintiff stated that the severity of the pain in these areas varies from day-to-day. (Id.). Plaintiff testified that she has experienced this pain for over a year. (Id.).

Plaintiff stated that she has had a lump in her back for a significant time. (Id.). Plaintiff testified that she has received different opinions about the lump in her back. (Id.). Plaintiff stated that she has been told that the lump was a muscle, a tumor, and arthritis. (Id.). Plaintiff testified that her doctors told her that they do not know for certain what the lump is until they cut it open. (Id.). Plaintiff stated that her doctors told her that she has fibroids throughout her body. (Id.).

Plaintiff testified that she experiences a constant dull pain in her back, which increases when she is active. (Tr. 226). Plaintiff stated that her pain level varies. (Id.). Plaintiff rated her pain as a ten on a scale of one to ten without medication and a seven with medication. (Id.). Plaintiff testified that she does not want to take stronger medication. (Id.). Plaintiff stated that she also takes muscle relaxers and that her doctors are planning on increasing the dosage because they are not working. (Id.). Plaintiff testified that her pain sometimes lasts only a few hours and other times lasts all day. (Id.). Plaintiff stated that her knee and shin had been hurting for three weeks. (Tr. 227). Plaintiff testified that her pain increases when she walks a lot. (Id.). Plaintiff stated that the injections are painful for about a week, after which she experiences some relief for about a week. (Id.).

Plaintiff testified that her pain prevents her from working. (Id.). Plaintiff stated that she tolerates the pain at home because she has to take care of herself and her children. (Id.).

Plaintiff testified that she has difficulty walking. (Id.). Plaintiff stated that she can walk for ten to fifteen minutes before she has to sit down due to severe pain. (Tr. 228). Plaintiff testified that she can sit for about thirty minutes before she has to get up and move. (Id.). Plaintiff stated that she is unable to stand in one place for very long before her legs start tingling. (Id.). Plaintiff testified that she is able to bend over and touch her knees. (Id.). Plaintiff stated

that she can stoop down with pain.  (Id.).

Plaintiff testified that she would be unable to carry a gallon or a half-gallon of milk all day.  (Id.).  Plaintiff stated that she has to use both hands to lift a gallon of milk.  (Tr. 229).  Plaintiff testified that her arms shake if she lifts heavy objects.  (Id.).  Plaintiff stated that she can only carry light groceries, such as bread.  (Id.).  Plaintiff testified that her children carry the heavy groceries.  (Id.).

Plaintiff stated that she has problems with her hands.  (Id.).  Plaintiff testified that her hands swell due to arthritis.  (Id.).  Plaintiff stated that she is unable to grip properly due to the swelling.  (Id.).  Plaintiff testified that she has dropped objects.  (Id.).

Plaintiff stated that she experiences more pain when the humidity is high.  (Tr. 230).

The ALJ indicated that he would ask Mr. Weimholt to retain his materials in the event that he would send him interrogatories.  (Id.).  The ALJ instructed plaintiff to submit the additional medical records within thirty days, although he would extend the time to sixty days if requested.  (Id.).

## B.    Relevant Medical Records

The record reveals that plaintiff presented to Donald S. Piland, M.D. on January 9, 2002, with complaints of left shoulder pain and right upper quadrant pain after eating fatty foods. (Tr. 179-81).  Dr. Piland's impression was: rule out cholelithiasis[3]/cholecystitis;[4] and bony nodules on

---

[3]Presence of concretions in the gallbladder or bile ducts.  Stedman's at 366.

[4]Inflammation of the gallbladder.  Stedman's at 365.

the knees and hands, uncertain etiology. (Tr. 181). Dr. Piland prescribed Prevacid,[5] ordered an ultrasound of the gallbladder, and referred plaintiff to Dr. Barnes for an orthopaedic consultation regarding bony nodules. (Id.). Plaintiff underwent an ultrasound of the gallbladder on January 11, 2002, which was normal. (Tr. 178).

Plaintiff presented to Dr. Piland on February 14, 2003. (Tr. 170). Dr. Piland noted that plaintiff left angry because he would not give her pain medication other than Ultram.[6] (Id.). Dr. Piland found that plaintiff had full range of motion. (Id.). Dr. Piland stated that he was concerned about plaintiff's elevated sugar and about the potential of a pancreatic mass. (Id.). Dr. Piland indicated that plaintiff had seen a specialist one year prior after an abnormal CT scan of the abdomen, but the specialist was not concerned at that time. (Id.). Dr. Piland stated that he wondered about the possibility of a malignancy due to plaintiff's glucose elevation. (Id.).

Plaintiff presented to Northwest Medical Center on March 10, 2003, at which time it was noted that the CT scan revealed no mass in the liver or pancreas. (Tr. 165). Plaintiff was diagnosed with right and left upper quadrant pain, new onset of diabetes mellitus,[7] and fibromyalgia.[8] (Id.).

---

[5]Prevacid is indicated for the treatment of ulcers. See Physician's Desk Reference (PDR), 3205 (59th Ed. 2005).

[6]Ultram is indicated for the management of moderate to moderately severe pain. See PDR at 2553.

[7]A chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced. It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, glycosuria, water and electrolyte loss, ketoacidosis, and coma. See Stedman's at 529.

[8]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. See Stedman's at 725.

The record reveals that plaintiff received treatment from Dr. D.K. Varma for various complaints, including back pain, headache, depression, cough, rash, and sore throat, from December 2003 through May 2006. (Tr. 187-96, 135-48). Dr. Varma treated plaintiff's complaints with medication. (Id.).

Plaintiff underwent right knee x-rays on January 13, 2004, which were normal. (Tr. 208).

Plaintiff presented to the Kneibert Clinic on June 22, 2004, with complaints of pain over the left kidney. (Tr. 200). Plaintiff underwent x-rays of the lumbar spine, which revealed mild facet arthrosis[9] at the L5-S1 level, which was consistent with early osteoarthritic changes. (Tr. 204). No other bone or joint abnormality was noted. (Id.).

Plaintiff presented to Northwest Medical Center on April 27, 2005, to be evaluated for Hepatitis C due to her husband's diagnosis. (Tr. 158). Plaintiff also complained of some knots in her lumbar spine that were causing pain that ran down the back of her leg and into her buttocks and her hip. (Id.). Upon examination, April Piland, R.N., noted palpable nodules in the lumbar spine and hip area, which she described as possible lipomas but quite tender to the touch. (Id.). Ms. Piland diagnosed plaintiff with diabetes mellitus; low back pain, suspected lipomas[10] versus tumor; fibromyalgia; and history of anemia.[11] (Id.). Ms. Piland recommended an MRI of the lumbar spine and hip. (Id.).

---

[9]Degenerative joint changes. Stedman's at 162.

[10]A benign neoplasm of adipose tissue, composed of mature fat cells. Stedman's at 1107.

[11]Any condition in which the number of red blood cells, the amount of hemoglobin and/or the volume of packed red blood cells of blood are less than normal. Anemia is frequently manifested by pallor of the skin and mucous membranes, shortness of breath, palpitations of the heart, lethargy, and tendency to fatigue. See Stedman's at 78.

Plaintiff underwent an MRI of the lumbar spine on May 4, 2005, which revealed a mild lateral disc bulge extraforaminally at L4-5 on the left; a mild central disc bulge at L5-S1 without evidence of disc herniation; and disc degenerative changes at L5-S1. (Tr. 157). Plaintiff also underwent an MRI of the hip, which was negative. (Tr. 156).

Plaintiff presented to Northwest Medical Center on May 26, 2005, for a follow-up of her osteoarthritis. (Tr. 154). Ms. Piland's assessment was severe osteoarthritis; upper respiratory infection; and diabetes mellitus. (Id.). Ms. Piland noted that plaintiff was not a surgical candidate but had reconsidered and will go to physical therapy. (Id.).

Plaintiff presented to Benjamin Soeter at the Poplar Bluff Regional Medical Center Pain Clinic on August 25, 2005. (Tr. 132). Plaintiff complained of left shoulder pain, bilateral knee pain, and low back pain. (Id.). Plaintiff indicated that she was taking Flexeril[12] and Hydrocodone[13] prescribed by Dr. Varma, which brought the pain down from 10+ out of 10 moderately well. (Id.). Dr. Soeter stated that an overall functional impairment was not indicated. (Id.). Upon examination, plaintiff was tender to palpation in the left bursa area, bilateral knee area medially and laterally, and low lumbar midline and paramedially. (Id.). Dr. Soeter's assessment was left subdeltoid bursitis,[14] bilateral knee apparent arthritis, left subacromial bursitis,[15] and

---

[12]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

[13]Hydrocodone is indicated for the relief of moderate to moderately severe pain. See PDR at 3240.

[14]Inflammation of the subdeltoid bursa lying between the deltoid muscle and the underlying proximal humerus and rotator cuff. Stedman's at 283.

[15]Inflammation of the subacromial bursa lying between the acromion above and the rotator cuff below. Stedman's at 283.

enthesopathy[16] of the back.  (Id.).  Dr. Soeter recommended physical therapy, x-rays, and an MRI of the low back.  (Id.).  Plaintiff indicated that she could not afford physical therapy.  (Id.).

Plaintiff presented to Dr. Soeter on September 7, 2005, at which time she rated her pain as a 10+ out of 10.  (Tr. 129).  Dr. Soeter stated that plaintiff's overall functional impairment was a 0 to 2 out of 10.  (Id.).  Dr. Soeter's assessment was left subdeltoid bursitis, left subacromial bursitis, apparent bilateral knee arthritis, and enthesopathy of the back.  (Id.). Dr. Soeter administered a left subacromial bursa injection.  (Id.).

Plaintiff presented to Dr. Soeter on October 7, 2005, at which time she complained of persistent left flank pain, which she rated as a 10+ out of 10.  (Tr. 126).  Dr. Soeter noted that plaintiff was taking Hydrocodone prescribed by Dr. Varma, although plaintiff wanted a new primary care doctor.  (Id.).  Dr. Soeter noted that plaintiff's overall functional impairment was unchanged.  (Id.).  Dr. Soeter's assessment was left subdeltoid bursitis, left subacromial bursitis, apparent bilateral knee arthritis, and enthesopathy of the back.  (Id.).  Dr. Soeter administered another left subacromial bursa injection.  (Id.).  He noted that plaintiff was scheduled to see Dr. Davis for left flank pain work-up.  (Id.).

Plaintiff underwent an MRI of the lumbar spine on October 18, 2005, which revealed posterior bulging disc at the L5-S1 and to a lesser degree the L4-5 levels; and degenerative disc disease of the L5-S1 level.  (Tr. 150).

Plaintiff presented to Kevin P. Rankin, M.D., on March 8, 2006, with complaints of lower back pain that had been present for several months.  (Tr. 134).  Plaintiff indicated that the pain

---

[16]A disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules.  Stedman's at 649.

occurs in the left lower lumbar area, radiates down in the posterior aspect of the left buttock, and down the posterior aspect of the left leg to the plantar surface of the left foot. (Id.). Plaintiff also complained of weakness in the left lower extremity, and a palpable subcutaneous nodule in this area. (Id.). Dr. Rankin noted that Dr. Nichols had referred plaintiff for a surgical consultation. (Id.). Upon physical examination, Dr. Rankin noted a small subcutaneous lipoma of the lower back to the left of the midline, with no erythema. (Id.). Dr. Rankin also noted some muscular weakness of the left lower leg, weakness of the quadriceps, and weakness of the plantar flexion of the left foot. (Id.). Dr. Rankin expressed the opinion that plaintiff's low back pain and left lower extremity pain was not related to the lipoma of the lumbosacral area but was due to nerve root compression at the L5 and possible S1 nerve root. (Id.). Dr. Rankin stated that plaintiff would be referred to neurosurgery for further evaluation of her lumbar disc disease. (Id.).

Plaintiff presented to Dr. Soeter on June 9, 2006, at which time she rated her pain as a 10 to 10+ out of 10 taking Hydrocodone. (Tr. 124). Plaintiff reported that the injections she had undergone provided no relief. (Id.). Dr. Soeter stated that plaintiff's overall functional impairment was 0-2 out of 10. (Id.). Dr. Soeter's assessment was multiple joint pain, subdeltoid bursitis, left subactomial bursitis, bilateral knee arthritis, multiple joint pain, and enthesopathy of the back. (Id.). Dr. Soeter recommended a rheumatology evaluation. (Id.). He indicated that plaintiff refused further injection techniques. (Id.).


### The ALJ's Determination

The ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since January 1, 2003, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq*.).

2.       The claimant has the following severe impairments: bursitis, degenerative joint disease, and degenerative disc disease of the lumbar spine (20 CFR 416.920(c)).

The claimant alleges disability since January 2003 due to diabetes mellitus, fibromyalgia, and arthritis. The medical evidence shows that she was found upon MRI study to have mild disc bulging in the lumbar spine, as well as disc degenerative changes. She has not been a surgical candidate but has been referred to physical therapy. In March 2006, upon examination by Kevin P. Rankin, M.D., the claimant was found to have some muscular weakness in the left lower leg and foot, which was the result of nerve root compression.

The claimant has complained of shoulder, back and knee pain. She has been diagnosed upon recent examinations to have bursitis of the left shoulder and arthritis in the knees. The claimant has been treated with injections in the affected joints.

3.       The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.       After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to sit about six hours total in an eight-hour workday, stand/walk for short periods of time during the day in order to carry out job duties, and lift/carry up to ten pounds of weight.

5.       The claimant has no past relevant work (20 CFR 416.965).

6.       The claimant was born on May 9, 1962 and was 43 years old on the date the application was filed, which is defined as a younger individual age 45-49 (20 CFR 416.963).

7.       The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.       Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.       Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.      The claimant has not been under a "disability," as defined in the Social Security

Act, since June 17, 2005 (20 CFR 416.920(g)), the date the application was filed.

(Tr. 12-14).

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income filed on June 17, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 15).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.     Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next contends that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation. Plaintiff finally argues that the ALJ erred in relying on the Grids at step five of the sequential analysis. The undersigned will address plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

**1.     Credibility Analysis**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain

and limitation not credible. Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working

are credible.

In his opinion, the ALJ properly pointed out <u>Polaski</u> factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that, despite plaintiff's allegations of disabling pain, she has refused aggressive treatment. (Tr. 13). Specifically, the ALJ noted that plaintiff refused physical therapy in August 2005 and injections in June 2006. (Tr. 13, 132, 124). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 819 (8th Cir. 2003). Although plaintiff claimed that she failed to attend physical therapy due to a lack of finances, there is no indication that plaintiff ever attempted to receive treatment and was refused due to lack of funds. In fact, as the ALJ noted, plaintiff was receiving Medicaid benefits when she reported to Dr. Soeter that she could not afford physical therapy. (Tr. 13, 132, 217).

The ALJ next discussed plaintiff's work record. The ALJ noted that plaintiff poor work history detracts from her credibility. (Tr. 13). The ALJ pointed out that plaintiff has a record of nominal earnings, even before her alleged onset date, and that an award of SSI benefits would likely result in more annual income than plaintiff has ever earned by working. (<u>Id.</u>). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996). A poor work history prior to the alleged onset of disability lessens the credibility of a plaintiff's allegations of disabling pain. See <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1214 (8th Cir. 1993).

The ALJ next stated that plaintiff has a tendency to exaggerate her symptoms. (Tr. 13). The ALJ noted that at plaintiff's most recent appointment with Dr. Soeter, plaintiff rated her pain as a "10+" on a scale of one to ten. (Tr. 13, 124). The ALJ also stated that, despite these

allegations, plaintiff answered questions in a clear and logical manner and did not display any outward signs of pain during the hearing. (Tr. 14). While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), the ALJ's observations of the claimant's appearance and demeanor during the hearing is a consideration. See Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations."). As such, the ALJ properly considered plaintiff's demeanor at the hearing.

The ALJ finally noted that no treating or examining physician has placed any restrictions on plaintiff's activities or expressed the opinion that plaintiff is disabled. (Tr. 14). The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2. **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining her residual functional capacity.

Specifically, plaintiff contends that the there is no medical evidence to support the ALJ's determination. Defendant argues that the residual functional capacity formulated by the ALJ is supported by substantial evidence.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to sit about six hours total in an eight-hour workday, stand/walk for short periods of time during the day in order to carry out job duties, and lift/carry up to ten pounds of weight.

(Tr. 13).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer**,** 245 F.3d at 704.

Here, the ALJ did not cite any medical evidence in support of his residual functional capacity determination. In fact, the ALJ provided no explanation whatsoever for his determination. Further, there is no opinion by any physician, treating or consulting, regarding

plaintiff's ability to function in the workplace. As such, there is no medical evidence on the record suggesting that plaintiff can, or cannot, perform sedentary work. At most, the ALJ determined what plaintiff can do based on the subjective complaints that the ALJ found credible, but the RFC must be based on some medical evidence; if there is no such evidence, the RFC "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703. As such, the ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace.

Accordingly, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record and to order additional medical information addressing plaintiff's ability to function in the workplace.

### 3.     Medical-Vocational Guidelines

Plaintiff lastly argues that the ALJ erred by using the Medical-Vocational Guidelines, commonly known as the "Grids," instead of obtaining vocational expert testimony because plaintiff experiences significant pain, which is a non-exertional impairment. Plaintiff contends that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past

relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in Grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are non-exertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a non-exertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert. The ALJ acknowledged that plaintiff suffers from bursitis, degenerative joint disease, and degenerative disc disease of the lumbar spine. (Tr. 12). Plaintiff experiences significant pain due to these impairments. Pain has been found to be a non-exertional impairment.

See Gray, 192 F.3d at 802. As discussed above, the ALJ formulated a residual functional capacity that was not supported by substantial evidence. Based on this erroneous residual functional capacity, he then applied the Medical-Vocational Guidelines and determined that plaintiff could perform other work existing in significant numbers in the national economy.

Accordingly, the undersigned will order that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict her ability to perform jobs in the national economy.

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence. The ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace. The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity. The ALJ then relied upon the Medical-Vocational Guidelines to find plaintiff not disabled. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this __18th__ day of March, 2009.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE